# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

| | |
|---|---|
| Kay Diane Ansley, Catherine "Cathy" McGaughey, Carol Ann Person, Thomas Roger Person, Kelley Penn, and Sonja Goodman, <br><br>                      Plaintiffs, <br><br> vs. <br><br> State of North Carolina, <br><br>                      Defendant, <br><br> and <br><br> Phil Berger, President Pro Tempore of the North Carolina Senate, and Tim Moore, Speaker of the North Carolina House of Representatives, on behalf of the North Carolina General Assembly, <br><br>             Proposed Defendant-Intervenors. | <br><br><br><br><br><br><br><br><br> Case No.: 1:15-cv-274 |

## BRIEF IN SUPPORT OF PROPOSED DEFENDANT-INTERVENORS' MOTION TO DISMISS

Robert D. Potter, Jr.
Attorney at Law
2820 Selwyn Ave., Suite 840
Charlotte, NC 28209
(704) 552-7742
rdpotter@rdpotterlaw.com


John C. Eastman*
CENTER FOR CONSTITUTIONAL JURISPRUDENCE
c/o Chapman University Fowler School of Law
One University Dr.
Orange, CA 92866
(877) 855-3330
(714) 844-4817 Fax
jeastman@chapman.edu

James A. Campbell*
Kenneth J. Connelly*
Douglas G. Wardlow*
Jonathan Caleb Dalton*
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
jcampbell@ADFlegal.org
kconnelly@ADFlegal.org
dwardlow@ADFlegal.org
cdalton@ADFlegal.org

*Attorneys for Proposed Defendant-Intervenors*

*\*Notice of Appearance to be filed*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................. 2

I.   The Complaint should be dismissed because it is barred by Eleventh
     Amendment immunity and the Court lacks Article III jurisdiction to
     entertain a suit against the State. ................................................................. 2

II.  Plaintiffs lack standing to bring any of their claims. ..................................... 3

     A.   Plaintiffs lack standing to bring their Equal Protection and Due
          Process claims. ...................................................................................... 3

          1.   Plaintiffs' alleged "potential appearance in court" harm does
               not meet the requirements for standing. .......................................... 4

          2.   Plaintiffs' alleged "right to marry" harm is illusory and does
               not meet the requirements for standing. ......................................... 10

     B.   Plaintiffs lack standing to bring their Establishment Clause claim ............. 11

III. The Complaint should be dismissed under Fed. R. Civ. P. 12(b)(6). .................... 16

     A.   Plaintiffs' Equal Protection and Due Process claims fail to state a
          claim upon which relief can be granted. ...................................................... 16

     B.   Plaintiffs' Establishment Clause claim fails to state a claim upon
          which relief can be granted. ...................................................................... 17

CONCLUSION ............................................................................................................. 24

# TABLE OF AUTHORITIES

***Cases*:**

*Aetna Life Insurance Co., v. Lavoie,*
    475 U.S. 813 (1986)..................................................................................................17

*Allen v. Wright,*
    468 U.S. 737 (1984)...............................................................................................4, 8

*Arizona Christian School Tuition Org. v. Winn,*
    563 U.S. 125 (2011)...........................................................................................12, 13

*Bowen v. Kendrick,*
    487 U.S. 589 (1988)..................................................................................................13

*Brown v. Polk County, Iowa,*
    61 F.3d 650 (8th Cir. 1995) ....................................................................................19

*Caperton v. A.T. Massey Coal Co.,*
    556 U.S. 868 (2009)..................................................................................................17

*Clapper v. Amnesty Int'l USA,*
    133 S. Ct 1138 (2013).........................................................................................4, 5, 9

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,*
    483 U.S. 327 (1987)...........................................................................................18, 23

*Cutter v. Wilkinson,*
    544 U.S. 709 (2005)............................................................................................ 18-22

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006)....................................................................................3, 12, 13, 14

*Doe v. Obama,*
    631 F.3d 157 (4th Cir. 2011) ....................................................................................9

*Doremus v. Board of Education of Borough of Hawthorne,*
    342 U.S. 429 (1952)..................................................................................................12

*Flast v. Cohen,*
    392 U.S. 83 (1968)......................................................................................... 1, 2, 13-16

*General Synod of the United Church of Christ v. Resinger,*
    12 F. Supp. 3d 790 (W.D.N.C. 2014) ..................................................................20, 21

*Good News Club v. Milford Central School*,
533 U.S. 98 (2001)...................................................................................................23

*Grutter v. Bollinger*,
539 U.S. 306 (2003).................................................................................................24

*Hein v. Freedom From Religion Foundation Inc.*,
551 U.S. 587 (2007).......................................................................................6, 12, 14

*Hobbie v. Unemployment Appeals Commission of Florida*,
480 U.S. 136 (1987).................................................................................................18

*Hollingsworth v. Perry*,
133 S. Ct. 2652 (2013)...............................................................................................8

*Hunt v. McNair*,
413 U.S. 734 (1973).................................................................................................23

*Larson v. Valente*,
456 U.S. 228 (1982).................................................................................................20

*Lemon v. Kurtzman*,
403 U.S. 602 (1971).......................................................................................22, 23, 24

*Lexmark International, Inc. v. Static Control Components, Inc.*,
134 S. Ct 1377 (2014)................................................................................................4

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)...........................................................................................3, 4, 8

*Massachusetts v. Mellon*,
262 U.S. 447 (1923).................................................................................................12

*Obergefell v. Hodges*,
135 S. Ct. 2584 (2015).................................................................................4, 16, 17, 21

*Pennhurst State School & Hospital v. Halderman*,
465 U.S. 89 (1984)................................................................................................2, 3

*Quern v. Jordan*,
440 U.S. 332, (1979)..................................................................................................3

*Rosenberger v. Rector & Visitors of University of Virginia*,
515 U.S. 819 (1995)............................................................................................17, 18

*In re Secretary of Department of Crime Control & Public Safety,*
    7 F.3d 1140 (4th Cir. 1993) ......................................................................3

*Slater v. Douglas County,*
    743 F. Supp. 2d 1188 (D. Or. 2010) .............................................10, 19

*Town of Greece, New York v. Galloway,*
    134 S. Ct. 1811 (2014) ...........................................................................23

*Trans World Airlines, Inc. v. Hardison,*
    432 U.S. 63 (1977) .................................................................................19

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,*
    454 U.S. 464 (1982)...............................................................................14

*Van Orden v. Perry,*
    545 U.S. 677 (2005)...............................................................................23

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
    429 U.S. 252 (1977).................................................................................8

*Walz v. Tax Commission of City of New York,*
    397 U.S. 664 (1970)................................................................ 18, 21- 23

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990).................................................................................7

*Will v. Michigan Department of State Police,*
    491 U.S. 58 (1989)...............................................................................2, 3

*Withrow v. Larkin,*
    421 U.S. 35 (1975)................................................................................17

*Zelman v. Simmons-Harris,*
    536 U.S. 639 (2002)..............................................................................23

*Zorach v. Clauson,*
    343 U.S. 306 (1952)........................................................................19, 23

### ***Statutes*:**

42 U.S.C.A. § 2000e(a)-(b).........................................................................19

N.C. Gen. Stat. § 51-1 ................................................................................20

N.C. Gen. Stat. § 51-5.5(a) ....................................................9, 11, 16, 20, 22

N.C. Gen Stat. § 7A-292(a)(9) ........................................................................................20

U.S. Const. Amend I. ....................................................................................................23

***Other Authorities*:**

Bryan Dearinger, *The Future of Taxpayer Standing in Establishment Clause Tax Credit Cases*, 92 Or. L. Rev. 263 (2013)..........................................................................................................14

Charles Alan Wright et al., Federal Practice and Procedure (3d ed. 1998) ..............................9, 10

Douglas Laycock, *The Religious Exemption Debate*, 11 Rutgers J. L. & Religion 139 (2009) ...............................................................................20, 21

## INTRODUCTION

In enacting Senate Bill 2, the General Assembly struck a laudable balance between its constitutional obligation to protect the free exercise of religion and its duty to ensure that everyone has access to marriage. That statute is a model for how a diverse people should govern themselves in the midst of cultural discord. Plaintiffs disagree, however, believing that the United States Constitution leaves no room to accommodate the religious beliefs of their fellow citizens. So they have filed this suit alleging that Senate Bill 2 violates the Establishment Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment. Their Complaint should be dismissed for three independent reasons.

First, Plaintiffs' Complaint is foreclosed by the Eleventh Amendment. That constitutional provision affords the states immunity from suit. But Plaintiffs have named the State of North Carolina as the defendant here, and thus the Eleventh Amendment bars their claims.

Second, Plaintiffs lack standing to raise their claims. With respect to their Equal Protection and Due Process claims, Plaintiffs allege that LGBT individuals *might* be aggrieved *if* they one day appear before magistrates who, having recused themselves from performing marriages, *might* not judge them fairly. But that injury is far too speculative and disconnected from Senate Bill 2 to confer standing. Also, as part of their Equal Protection and Due Process claims, Plaintiffs allege that Senate Bill 2 negatively impacts their marriage rights. Yet they fail to explain how that is so or present any concrete harm connected with those allegations. Thus, they lack standing to raise any of the alleged injuries pled under their Equal Protection and Due Process claims. Moreover, Plaintiffs do not have standing to raise their Establishment Clause claim because federal courts generally forbid taxpayer standing, and Plaintiffs cannot fit their Establishment Clause claim within the narrow exception to this general rule set forth in *Flast v.*

1

*Cohen*, 392 U.S. 83 (1968).

Third, Plaintiffs have not stated a claim upon which relief can be granted. This Court cannot grant relief on Plaintiffs' Equal Protection and Due Process claims because Plaintiffs have not alleged facts sufficient to establish a claim under those constitutional provisions. The Establishment Clause claim is similarly unsupportable because Senate Bill 2 does not prefer a particular faith or encourage religion, but merely lifts a government-imposed burden on religious exercise. It is well established that the Establishment Clause does not forbid the State from accommodating religion in this way. Thus, Plaintiffs' Complaint should be dismissed in its entirety.

## ARGUMENT

**I.    The Complaint should be dismissed because it is barred by Eleventh Amendment immunity and the Court lacks Article III jurisdiction to entertain a suit against the State.**

Plaintiffs have sued the "State of North Carolina," Compl. ¶ 4 (ECF No. 1), and requested relief "enjoining" the State from enforcing Senate Bill 2, *id.* at p. 19. Yet absent clear exception, "[t]he Eleventh Amendment bars such suits." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989). Furthermore, Eleventh Amendment immunity deprives federal courts of Article III jurisdiction to entertain a suit against the State. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984) ("[T]he fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III. Thus . . . a federal court [may] not entertain a suit brought by a citizen against his own State.") (citations omitted).

There are exceptions to Eleventh Amendment immunity, but none apply here. One exception is when "the State has waived its immunity." *Will*, 491 U.S. at 66. To do this, a "State's consent [must] be unequivocally expressed." *Pennhurst*, 465 U.S. at 99. The State of North Carolina, however, has done nothing to waive its immunity here.

2

Another exception to Eleventh Amendment immunity applies when "Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity." *Will*, 491 U.S. at 66. While Congress may abrogate a State's immunity, it must do so through an "unequivocal expression of congressional intent to 'overturn the constitutionally guaranteed immunity of the several States.'" *Pennhurst*, 465 U.S. at 99 (quoting *Quern v. Jordan,* 440 U.S. 332, 342 (1979). Here, Plaintiffs bring each of their claims "pursuant to 42 U.S.C. § 1983." Compl. ¶ 79 (Claim I); Compl. ¶ 94 (Claim II); Compl. ¶ 102 (Claim III). But "Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity . . . ." *Will*, 491 U.S. at 66; *see also Quern*, 440 U.S. at 341 (refusing to conclude that "Congress intended by the general language of § 1983 to override the traditional sovereign immunity of the States"); *In re Sec'y of Dep't of Crime Control & Pub. Safety*, 7 F.3d 1140, 1149 (4th Cir. 1993) ("While Congress may abrogate a State's Eleventh Amendment immunity by express statutory language, it has long been settled that 42 U.S.C. § 1983, which is the ultimate basis for [the plaintiffs'] claim here, does not effect such an abrogation.") (citation omitted).

Because neither of these exceptions to Eleventh Amendment immunity applies here, this Court must dismiss Plaintiffs' Complaint.

## II.     Plaintiffs lack standing to bring any of their claims.

### A.     Plaintiffs lack standing to bring their Equal Protection and Due Process claims.

Plaintiffs "must demonstrate standing for each claim [they] seek[] to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). The "irreducible constitutional minimum of standing" requires Plaintiffs to have (1) suffered an "injury in fact," (2) that is "fairly . . . trace[able] to the challenged action of the defendant," and (3) is "likely" to be

3

"redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotation marks omitted).

Here, Plaintiffs claim that Senate Bill 2 violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. Plaintiffs specifically allege that Senate Bill 2 is constitutionally infirm under those Clauses for two reasons: first, because "gay and lesbian citizens like [them] may have to appear in . . . civil or criminal proceedings before . . . magistrates" who have recused from solemnizing marriages, Compl. ¶¶ 96, 104; and second, because Senate Bill 2 "rejects . . . the fundamental right and equal dignity of marriage for gays and lesbians" as established in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), Compl. ¶ 98; *see also* Compl. ¶ 109 (similarly claiming that Senate Bill 2 "rejects . . . the substantive due process rights of gays and lesbians to the dignity of marriage"). As explained below, these allegations fail to meet the requirements of standing, and therefore Plaintiffs cannot invoke the jurisdiction of this Court.

> 1. **Plaintiffs' alleged "potential appearance in court" harm does not meet the requirements for standing.**
>
>> a. **The alleged "potential appearance in court" harm is speculative.**

For an injury to be cognizable, it must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560; *see also Allen v. Wright*, 468 U.S. 737, 751 (1984) ("The injury alleged must be . . . distinct and palpable . . . and not abstract") (quotation marks and citation omitted), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). "Although imminence is . . . a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes . . . ." *Lujan*, 504 U.S. at 564 n.2 (quotation marks omitted). The Supreme Court has thus "repeatedly reiterated that threatened

4

injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quotation marks and alterations omitted) (collecting other Supreme Court cases).

Yet Plaintiffs' "potential appearance in court" injury is not a certainly impending harm. On the contrary, that alleged injury is based on layers of speculation. Indeed, Plaintiffs allege that "[g]ay or lesbian citizens like [them] *may* have to appear" before magistrates who have recused from performing marriages under Senate Bill 2 because their religious beliefs preclude them from solemnizing same-sex marriages. Compl. ¶ 96 (emphasis added); *accord id.* at ¶ 104. But their repeated use of the word "may" betrays the absence of an imminent injury. *See Clapper*, 133 S. Ct. at 1148-49 (finding that plaintiffs "merely speculate[d]" as to their alleged injury where their allegations repeatedly referenced what "may" happen).

Distilled to its essential elements, Plaintiffs' "potential appearance in court" harm rests on at least three speculative links in "a highly attenuated chain of possibilities" and therefore "does not satisfy the requirement that threatened injury must be certainly impending." *Id.* at 1148. Plaintiffs speculate, first, that they might one day appear before a magistrate; second, that the magistrate before whom they might appear will be one who has recused from performing weddings; and third, that that magistrate will have recused from performing weddings because her religious beliefs preclude her from solemnizing same-sex marriages. It is not certainly impending that any of these events will come to pass—let alone that all of them will. Plaintiffs thus have failed to allege a cognizable injury.

First, it is sheer conjecture that Plaintiffs might one day appear before a magistrate. Nowhere do Plaintiffs allege that they have ever appeared before a magistrate, that they will soon appear before a magistrate, or that they are ever likely to appear before magistrate. This first

layer of speculation—standing alone—is sufficient to defeat Plaintiffs' standing.

Second, even if a Plaintiff were to come before a magistrate, it is pure speculation to assume that the magistrate would be one who has recused from performing marriage. This is true even in McDowell County (and even granting Plaintiffs' allegation that "all of the magistrates in McDowell County recused themselves from performing marriages," Compl. ¶ 68). After all, magistrates in McDowell County will come and go. Some will recuse from solemnizing marriages, and others will not. At the time that a Plaintiff might one day appear before a magistrate in McDowell County, there is no telling whether that magistrate will have recused from performing wedding ceremonies.[1]

Third, even if a Plaintiff were to appear before a magistrate who has recused from performing weddings, that magistrate might have recused for a reason other than his or her beliefs about same-sex marriage. For instance, the magistrate might have recused because of a religious objection to marrying people of different faiths or people who have previously been divorced, because of a religious belief that marriage is a religious institution in which the State should not be involved, or because of a religious belief that marriage is the union of a man and a woman (and thus a corresponding inability to solemnizing any other union as a marriage). This consideration compounds the speculation that permeates Plaintiffs' attempt to establish Article III standing.[2]

In addition to these three speculative links in Plaintiffs' attenuated chain of possibilities,

---

[1] Even if a magistrate before whom Plaintiffs might appear has recused from performing marriages, it is highly unlikely that Plaintiffs would know about the recusal. That absence of knowledge further weakens Plaintiffs' efforts to establish standing.

[2] Even if a magistrate before whom Plaintiffs might appear has recused from performing marriages because her religious beliefs preclude her from solemnizing same-sex marriages, it is highly unlikely that Plaintiffs would know about the recusal or the reason for it. That absence of knowledge additionally undermines Plaintiffs' quest to plead a cognizable injury in fact.

6

Plaintiffs' "potential appearance in court" injury rests on even more conjecture. The supposed harm seems to rest on Plaintiffs' assumption that magistrates whose religious beliefs preclude them from solemnizing same-sex marriages will be incapable of impartially adjudicating a civil or criminal proceeding involving a member of the LGBT community. But that assumption about what might be in the mind of a hypothetical magistrate deciding a hypothetical case is wholly unfounded and baseless. *See Whitmore v. Arkansas*, 495 U.S. 149, 159-60 (1990) (rejecting a theory of standing that depended on speculation regarding another legal proceeding because "[i]t is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result").

And layered within that baseless assumption is even more conjecture, for it presupposes that magistrates who hold the religious belief that Plaintiffs dislike will know the sexual orientation of the parties who appear before them. But it is extremely unlikely that a magistrate will know that information, particularly because, as Plaintiffs admit, magistrates primarily "issue search and arrest warrants, set bail for arrestees, and . . . handle pleas and the payment of fines for certain traffic violations and specified misdemeanors." Compl. ¶ 21. Nothing about those kinds of proceedings suggests that magistrates will know the sexual orientation of the parties appearing before them.

Nor do Plaintiffs improve their standing arguments by attempting to invoke the rights and interests of other "gay or lesbian citizens like [them]." Compl. ¶¶ 96, 104; *see also id.* at ¶¶ 97, 105. It is axiomatic that "in the ordinary course, a litigant . . . cannot rest a claim to relief on the legal rights or interests of third parties." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2663 (2013) (quotation marks and alterations omitted); *Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263 (1977) (same). Hence, Plaintiffs do not benefit from mentioning the interests

7

of gay and lesbian citizens not before this Court.

Plaintiffs also claim that they are seeking to vindicate "the constitutional integrity of the judicial system." Compl. ¶¶ 96, 104. But such a generalized grievance shared by large groups of citizens is not a valid basis for invoking a federal court's jurisdiction. *See Hollingsworth*, 133 S. Ct. at 2662 "[A] generalized grievance . . . is insufficient to confer standing.") (quotation marks omitted); *Lujan*, 504 U.S. at 573-74 (stating that "a generally available grievance about government . . . does not state an Article III case or controversy"); *Allen*, 468 U.S. at 754-55 (holding that "a claim of stigmatic injury, or denigration, suffered by all members of a racial group when the Government discriminates on the basis of race" does not constitute a cognizable injury because only those "who are personally denied equal treatment" have standing to challenge allegedly discriminatory government action).

In short, Plaintiffs' allegations in support of their "potential appearance in court" harm fall well short of establishing a cognizable injury in fact. The absence of a cognizable injury demonstrates conclusively that Plaintiffs lack standing.

   **b.**  **The alleged "potential appearance in court" harm is not fairly traceable to Senate Bill 2.**

Additionally, Plaintiffs have not shown that their "potential appearance in court" harm is fairly traceable to the enactment of Senate Bill 2. Plaintiffs complain that as a result of Senate Bill 2, they might one day receive an adverse ruling in a hypothetical case before a magistrate who they speculate will be unfair to gays and lesbians. Senate Bill 2, however, is not the cause of that alleged harm (assuming that it ever comes to pass).

There are at least three reasons why this is so. First, Senate Bill 2 is not the reason why Plaintiffs might eventually appear before a magistrate. That court appearance would occur only if Plaintiffs engage in conduct (such as exceeding the speed limit while driving) that gives rise to a

civil or criminal proceeding within the jurisdiction of a magistrate. Second, the purported lack of impartiality in the hypothetical case that Plaintiffs reference is not attributable to Senate Bill 2. Nothing about that statute authorizes magistrates to treat LGBT citizens unfairly when adjudicating the civil or criminal cases assigned to them. That statute merely permits magistrates to recuse from performing any and all weddings. *See* N.C. Gen. Stat. § 51-5.5(a). It has no impact on how a magistrate will decide civil or criminal cases. Third, the purported lack of impartiality in the hypothetical case that Plaintiffs reference is attributable to the decisionmaking of the magistrates in the exercise of their judgment. Speculation on how an independent judicial actor might rule or reason in a hypothetical case breaks the causal link between Senate Bill 2 and the injury that Plaintiffs allege. *See Clapper*, 133 S. Ct. at 1149-50 (finding that plaintiffs' speculation as to whether an independent court might authorize a wiretap of their communications undermined their standing argument); *Doe v. Obama*, 631 F.3d 157, 162 (4th Cir. 2011) (holding that "where a third party . . . makes [an] independent decision that causes an injury, that injury is not fairly traceable to the government").

c. **The alleged "potential appearance in court" harm will not be redressed by a ruling for Plaintiffs.**

Plaintiffs cannot show that their "potential appearance in court" injury will be redressed by a ruling in their favor. Redressability analysis mirrors the causation analysis discussed above. *See* 13A Charles Alan Wright et al., Federal Practice and Procedure § 3531.5 (3d ed. 1998) (stating that in most cases "if the injury is not caused by the challenged acts, an order directed to them will not redress it"). Thus, all the reasons that Plaintiffs' "potential appearance in court" injury is not fairly traceable to Senate Bill 2 confirm that a ruling invalidating that statute would not redress this alleged harm.

That purported harm is not redressable for another reason—even if Senate Bill 2 were

Case 1:15-cv-00274-MOC-DLH   Document 17-2   Filed 02/04/16   Page 15 of 32

struck down, there would continue to be magistrates throughout the State whose religious beliefs about marriage preclude them from solemnizing a same-sex union as a marriage. For example, magistrates who hold those religious beliefs but work during times when their office does not perform weddings (like during the night shift) would never have occasion to recuse from performing marriages under Senate Bill 2. Thus, even if Senate Bill 2 were invalidated, these magistrates would continue in their positions.

Additionally, magistrates who hold the religious beliefs about marriage that Plaintiffs dislike may successfully request and obtain (or, in the absence of an approved request, litigate and win) a Title VII religious accommodation for their inability to solemnize marriages. *See Slater v. Douglas Cnty.*, 743 F. Supp. 2d 1188 (D. Or. 2010) (refusing to dismiss a Title VII religious-accommodation claim of a county employee whose religious beliefs precluded her from processing paperwork for same-sex domestic partnerships). So again, even if Plaintiffs were to succeed in striking down Senate Bill 2, these magistrates would remain in their jobs and thus might one day preside over a case involving Plaintiffs or other LGBT citizens. Consequently, Plaintiffs cannot show that a judgment in their favor will redress the "potential appearance in court" harm that they allege.

> **2.    Plaintiffs' alleged "right to marry" harm is illusory and does not meet the requirements for standing.**

For their "right to marry" harm under the Equal Protection and Due Process claims, Plaintiffs allege that Senate Bill 2 "rejects . . . the fundamental right and equal dignity of marriage for gays and lesbians." Compl. ¶ 98; *see also* Compl. ¶ 109 (alleging that Senate Bill 2 "rejects . . . the substantive due process rights of gays and lesbians to the dignity of marriage"). But this allegation is stated at such an extreme level of abstraction that it is difficult to decipher what Plaintiffs intend. Even granting Plaintiffs an assortment of more concrete formulations for

this allegation gets them nowhere near the threshold required to establish an injury in fact sufficient to satisfy standing requirements.

To the extent that Plaintiffs mean to suggest that this "right to marry" harm means that they have actually been denied the right to marry, they have pled no facts to support such a claim. Plaintiffs Ansley and McGaughey are already married, Compl. ¶ 1, and Plaintiffs Penn and Goodman, who are engaged to be married, have not alleged any facts suggesting that they have been denied the right to marry, *id.* at ¶ 3. Alternatively, to the extent that Plaintiffs Penn and Goodman mean to imply they have suffered some inconvenience in their attempt to get married, this too must fail because they have alleged no impediment whatsoever. Nor could they, for Senate Bill 2 itself requires the State to "ensure that all individuals . . . seeking to be married . . . may marry." N.C. Gen. Stat. § 51-5.5(a). Finally, to the extent that Plaintiffs are suggesting that they or their marriages will be treated differently or with less dignity than other state-recognized marriages, they offer nothing more than their own say-so. Surely, nothing about Senate Bill 2 supports that claim. That statute does not direct, or even permit, the State to treat same-sex marriages different from any others.

Ultimately, then, Plaintiffs have failed to allege any facts showing that their "right to marry" harm qualifies as a constitutionally cognizable injury in fact. Thus, to the extent that Plaintiffs predicate their Equal Protection and Due Process claims on that abstract and ill-defined harm, those claims must be dismissed.

### B.     Plaintiffs lack standing to bring their Establishment Clause claim.

Plaintiffs' Establishment Clause claim must also be dismissed for lack of standing. Plaintiffs assert that Senate Bill 2 injured them as North Carolina taxpayers because that statute allegedly "orders the expenditure of taxpayer funds to accomplish [a] religious purpose in violation of the Establishment Clause." Compl. ¶ 82. This purported injury is the only basis for

standing that Plaintiffs allege with respect to their Establishment Clause claim. *Id.* at ¶ 7.

The United States Supreme Court has rejected the "proposition that an individual who has paid taxes has a 'continuing, legally cognizable interest in ensuring that those funds are not used by the Government in a way that violates the Constitution.'" *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011) (quoting *Hein v. Freedom From Religion Found. Inc.*, 551 U.S. 587, 599 (2007) (plurality)) (emphasis omitted). Because a federal taxpayer has an interest in Treasury funds that is "shared with millions of others," a claim based on a plaintiff's status as a federal taxpayer does not present a controversy appropriate for judicial resolution. *Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923). Instead, such a claim presents a general "matter of public . . . concern," not a particularized injury, and is appropriately addressed to the political branches of government. *Id.*

The prohibition on taxpayer standing in the federal courts applies with equal force whether the alleged expenditure is from state or federal coffers. *See*, *e.g.*, *Doremus v. Bd. of Educ. of Borough of Hawthorne*, 342 U.S. 429, 434 (1952) (holding that New Jersey taxpayers did not have standing to bring an Establishment Clause challenge in federal court). Indeed, permitting state taxpayers standing to challenge state expenditures on federal constitutional grounds merely "because their tax burden gives them an interest in the state treasury would interpose the federal courts as virtually continuing monitors of the wisdom and soundness of state fiscal administration, contrary to the more modest role Article III envisions for federal courts." *DaimlerChrysler*, 547 U.S. at 346 (quotation marks omitted). The seriousness of that concern is amplified in this case, where the challenged act does not make any specific appropriation, having at most an incidental impact on the state fisc. Affording taxpayer standing to Plaintiffs here would thus set up the federal courts as "continuing monitors of the wisdom and

Case 1:15-cv-00274-MOC-DLH   Document 17-2   Filed 02/04/16   Page 18 of 32

soundness" not only of state fiscal policy, but of all state policy that has any effect on the state treasury, no matter how indirect or modest, thereby usurping the state's general legislative prerogative. *Id.*

The Supreme Court has recognized only one "narrow exception" to the "general rule against taxpayer standing." *Bowen v. Kendrick*, 487 U.S. 589, 618 (1988). In *Flast v. Cohen*, the Court held that a federal taxpayer has "standing consistent with Article III to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of" the Establishment Clause because that Clause "specifically limit[s] the taxing and spending power . . . ." 392 U.S. 83, 105-106 (1968) (holding that federal taxpayers had standing to raise an Establishment Clause claim against an act of Congress that appropriated funds to establish a federal grant program for, among other things, public and private schools). Under the limited *Flast* exception, "individuals suffer a particular injury for standing purposes when, in violation of the Establishment Clause *and* by means of the 'taxing and spending power,' their property is transferred through the Government's Treasury to a sectarian entity." *Winn*, 563 U.S. at 139-40 (emphasis added).

Since *Flast* was decided in 1968, the Supreme Court has uniformly rejected attempts to expand this very narrow exception to other factual scenarios. The specific holding in *Flast* applied only to federal taxpayers challenging Congress's exercise of its taxing and spending power under the Establishment Clause. The Supreme Court has never held that *Flast* opens the federal courthouse doors to state taxpayers who wish to challenge state legislative action. Expanding *Flast* in that way would push the federal courts beyond their "modest role" as envisioned under Article III and permit them to interfere with myriad issues entrusted to the states. *DaimlerChrysler*, 547 U.S. at 346. To avoid doing that, this Court should read *Flast* in its

13

original context and conclude that it applies only to federal taxpayers challenging federal expenditures. *See* Bryan Dearinger, *The Future of Taxpayer Standing in Establishment Clause Tax Credit Cases*, 92 Or. L. Rev. 263, 319 (2013) ("[I]t is plain that 'the results in *Flast*' do not extend to state taxpayers.") (collecting cases).

Moreover, the *Flast* exception does not apply here because the two conditions for invoking that exception are not satisfied. First, there must be a "logical link" between the plaintiff's status as a taxpayer and the "type of legislative enactment attacked." 392 U.S. at 102. Under this factor, a plaintiff's status as a taxpayer can be logically linked to only one type of enactment: an express exercise of the legislative power to tax and spend.[3] It is "not . . . sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute." *Id.* In *Flast*, the plaintiffs satisfied that condition because they attacked "an exercise by Congress of its power under Art. I, § 8, to spend for the general welfare." *Id.* at 103. Second, there must be a "nexus" between the plaintiff's "status [as a taxpayer] and the precise nature of the constitutional infringement alleged." *Id.* at 102. The plaintiffs in *Flast* satisfied that condition because the history of the Establishment Clause definitively confirmed that the Clause "operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending

---

[3] Subsequent Supreme Court case law supports this conclusion. In *Hein*, the Court held that a federal agency's use of appropriated federal monies to promote the President's faith-based initiatives did not satisfy the first *Flast* condition because "the expenditures at issue . . . were not made pursuant to any act of Congress." 551 U.S. at 605. Rather, the monies spent were made available to the executive branch by general appropriations that "did not expressly authorize, direct, or even mention [those] expenditures." *Id.* Accordingly, there was no logical link between the plaintiffs' status as taxpayers and the type of legislative enactment attacked; thus, the general prohibition against taxpayer standing applied. *Id.* at 608-609. *See also Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 480 (1982) (holding that the plaintiffs lacked standing under *Flast* to challenge the transfer of federal property to a religious organization because the transfer was "not an exercise of authority conferred by the Taxing and Spending Clause of Art. I, § 8," but rather was "an evident exercise of Congress' power under the Property Clause, Art. IV, § 3, cl. 2").

14

power." *Id.* at 104.

Plaintiffs' Complaint does not meet either of the two *Flast* conditions. First, there is no "logical link" between Plaintiffs' taxpayer status and the "type of legislative enactment attacked" because Plaintiffs do not challenge an express exercise of the legislative power to tax and spend. *Id.* at 102. Indeed, Senate Bill 2 does not expressly appropriate any funds. The General Assembly enacted that law to accommodate the religious-freedom interests of magistrates and employees in registers of deeds' offices while simultaneously ensuring access to marriage for everyone in the State. Senate Bill 2 thus has entirely non-fiscal policy goals and is regulatory in nature. To the extent that the statute has some impact on state treasury funds, that impact is only incidental. Because it is "not . . . sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute," *id.*, *Flast*'s exception to the general prohibition against taxpayer standing does not apply here.

Second, Plaintiffs' Complaint does not establish a "nexus" between their status as taxpayers and "the precise nature of the constitutional infringement alleged." *Id.* Although this factor was satisfied in *Flast* because historical analysis left no doubt that "[t]he Establishment Clause . . . operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power," *id.* at 104, history does not suggest—let alone confirm—that the Establishment Clause was intended to specifically limit a state legislature's authority to regulate the process for forming a state-recognized marriage. Plaintiffs thus cannot satisfy the second *Flast* factor.

Because Plaintiffs' Establishment Clause claim does not satisfy either of the two independently necessary conditions of the *Flast* exception, the general bar against taxpayer standing prevents Plaintiffs from invoking this Court's jurisdiction.

**III.     The Complaint should be dismissed under Fed. R. Civ. P. 12(b)(6).**

**A.     Plaintiffs' Equal Protection and Due Process claims fail to state a claim upon which relief can be granted.**

As previously explained, Plaintiffs' Complaint alleges two harms in support of their Equal Protection and Due Process claims: their "potential appearance in court" harm and their "right to marry" harm. *See supra* at 4. Beginning with the "right to marry" harm, it is clear that Plaintiffs have failed to state a claim upon which relief can be granted. As explained above, the unmarried Plaintiffs (Penn and Goodman) have not alleged that the State is denying or otherwise impeding their ability to marry. *See supra* at 11. This is not surprising given that Senate Bill 2 expressly obligates state officials to "ensure that all individuals . . . seeking to be married before a magistrate may marry." N.C. Gen. Stat. § 51-5.5(a). Nor have the married same-sex Plaintiffs (Ansley and McGaughey) alleged any facts demonstrating that Senate Bill 2 treats their marriage different than any other state-recognized marriage. *See supra* at 11. Plaintiffs have thus failed to show that Senate Bill 2 contravenes the letter or spirit of *Obergefell*'s requirement that same-sex couples be permitted to marry "on the same terms and conditions as opposite-sex couples." 135 S. Ct. at 2605.

Turning to Plaintiffs' "potential appearance in court" harm, it is equally plain that Plaintiffs have failed to state a colorable claim. They allege that if gay or lesbian citizens appear before magistrates whose religious beliefs preclude them from personally solemnizing same-sex marriages, "the constitutional integrity of the judicial system" will be "maliciously" "impair[ed]." Compl. ¶¶ 96, 104. Plaintiffs thus imply that no magistrate who holds these "decent and honorable religious" convictions about marriage, *Obergefell*, 135 S. Ct. at 2602, can ever be fair to LGBT citizens appearing in a civil or criminal case. No precedent remotely supports that insinuation.

In fact, Supreme Court case law resoundingly refutes it. The Court has repeatedly stated that there is a "presumption of . . . integrity in those serving as adjudicators," *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), and that "allegations of bias and prejudice on [a] general basis . . . are insufficient to establish any constitutional violation," *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821 (1986). The few exceptions to these general principles arise in rare, extreme, and limited circumstances: (1) where an adjudicator has a pecuniary interest in the outcome of a case, *see Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877-79 (2009); (2) where the judge in a criminal contempt proceeding has "a conflict arising from his participation in an earlier proceeding," *id.* at 880-81; and (3) where "a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent," *id.* at 884. None of these extreme situations, or even an analogous set of circumstances, is presented here. Hence, Plaintiffs' attempt to ground their Equal Protection and Due Process claims in their "potential appearance in court" theory fails to state a claim upon which relief can be granted.[4]

**B. Plaintiffs' Establishment Clause claim fails to state a claim upon which relief can be granted.**

The Complaint alleges that Senate Bill 2 violates the Establishment Clause by allowing magistrates with sincerely held religious beliefs to recuse from performing marriages. Compl. ¶¶

---

[4] Plaintiffs' reliance on their "potential appearance in court" harm fails for another reason: it rests on open religious bigotry that the Constitution cannot permit. By bringing a facial challenge to Senate Bill 2, Plaintiffs ask this Court to conclude as a matter of law that any magistrate who cannot personally solemnize same-sex marriages because of his or her religious beliefs about the issue of marriage is automatically biased against LGBT individuals and unable to fairly adjudicate routine civil and criminal matters involving those citizens. But the courts cannot categorically equate a "decent and honorable" religious belief about marriage, *Obergefell*, 135 S. Ct. at 2602, with a bias against a group of people. Doing so would manifest "hostility to religion" in violation of the First Amendment. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 845-46 (1995).

79-89. Establishment Clause jurisprudence, however, demonstrates that Senate Bill 2's recusal process is an entirely permissible accommodation of religion that does not run afoul of the First Amendment. Accordingly, Claim I in Plaintiffs' Complaint does not state a claim upon which relief can be granted.

As a general matter, religious accommodations do not violate the Establishment Clause. The Supreme Court has "long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-145 (1987); *see e.g.*, *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (holding that the Religious Land Use and Institutionalized Persons Act (RLUIPA) "qualifies as a permissible legislative accommodation of religion that is not barred by the Establishment Clause"); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987) (holding that an exemption from Title VII's prohibition against religious discrimination in employment for religious organizations does not violate the Establishment Clause); *id.* at 338 ("There is ample room for accommodation of religion under the Establishment Clause"); *Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 680 (1970) (holding that property tax exemptions for religious organizations do not violate the Establishment Clause). Indeed, even a law that is singularly focused on accommodating the exercise of religion is permissible under the Establishment Clause because "[r]eligious accommodations . . . need not come packaged with benefits to secular entities." *Cutter*, 544 U.S. at 724 (quotation marks omitted).

More specifically, the Establishment Clause does not forbid the State from accommodating the religious beliefs of governmental employees. When the State "respects the religious nature of our people [by] accommodat[ing] the public service to their spiritual needs,"

"it follows the best of our traditions." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952) (upholding against constitutional challenge a government policy that releases students during the school day to visit religious centers for religious instruction or devotional exercises). Venerable laws like Title VII have long accommodated the religious convictions of public employees. *See Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 75 (1977) (explaining that under Title VII an employer has a "statutory obligation to make reasonable accommodation for the religious observances of its employees"); 42 U.S.C.A. § 2000e(a)-(b) (defining a covered "employer" to include "a person . . . who has fifteen or more employees," and defining "person" to include "governments" and "governmental agencies"). And courts have recognized that "[a] public sector employer does not unconstitutionally 'support' an employee's religious beliefs by granting an accommodation to [an] employee." *Slater*, 743 F. Supp. 2d at 1194-95 (refusing to dismiss a Title VII religious-accommodation claim of a county employee whose religious beliefs precluded her from processing paperwork for same-sex domestic partnerships); *see also Brown v. Polk Cty., Iowa*, 61 F.3d 650, 659 (8th Cir. 1995) (concluding that a government employer's alleged "'interest' in avoiding a claim . . . that [it has] violated the establishment clause" could not defeat a public employee's Title VII claim for a religious accommodation).

Supreme Court jurisprudence identifies several factors that determine whether a particular legislative accommodation of religious exercise is permissible under the First Amendment. Those factors confirm that Senate Bill 2 does not violate the Establishment Clause.

*First*, Senate Bill 2 does not establish religion because it does not prefer any particular religious faith or sect over another. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244, 255 (1982) (holding that a state statute imposing registration and reporting

requirements on religious organizations that solicited more than half of their funds from nonmembers violated the Establishment Clause by "burden[ing] or favor[ing] selected religious denominations"). Senate Bill 2 clearly complies with this principle. It provides the same marriage-solemnization recusal for "*[e]very* magistrate . . . based upon *any* sincerely held religious objection." N.C. Gen. Stat. § 51-5.5 (emphasis added). Accordingly, Senate Bill 2's religious accommodation is permissible. *See Cutter*, 544 U.S. at 723 (explaining that RLUIPA does not run afoul of the Establishment Clause in large part because it "does not differentiate among bona fide faiths").

*Second*, Senate Bill 2 does not contravene the Establishment Clause because it merely lifts a burden on religious exercise that the government created. "[G]overnment does not benefit religion by first imposing a burden through regulation and then lifting that burden through exemption." Douglas Laycock, *The Religious Exemption Debate*, 11 Rutgers J. L. & Religion 139, 153-54 (2009). For this reason, a legislative enactment that accommodates religion by "alleviat[ing] exceptional government-created burdens on . . . religious exercise" is entirely compatible with the Establishment Clause. *Cutter*, 544 U.S. at 720.

Here, a burden on religious exercise was created by the confluence of three government directives—that all couples must solemnize their marriages before an authorized celebrant, *see* N.C. Gen. Stat. § 51-1, that magistrates are authorized to perform marriage ceremonies, *see* N.C. Gen. Stat. § 7A-292(a)(9), and that same-sex couples are permitted to enter state-recognized marriages, *see General Synod of the United Church of Christ v. Resinger*, 12 F. Supp. 3d 790 (W.D.N.C. 2014). Before Senate Bill 2's enactment, magistrates who held a "decent and honorable religious" belief, *Obergefell*, 135 S. Ct. at 2602, that precluded them from personally presiding over same-sex marriages were in many instances forced to choose between their job

and their faith. Indeed, as Plaintiffs admit, some magistrates felt compelled to resign their positions. *See* Compl. ¶ 45. Senate Bill 2 does nothing more than lift this government-imposed burden on these magistrates, ensuring that they will not lose their jobs because of their religious beliefs. As a result, that statute does not run afoul of the Establishment Clause.

*Third*, Senate Bill 2 comports with the Establishment Clause because it does not encourage citizens to engage in (or discourage them from engaging in) religious exercise. *See Walz*, 397 U.S. at 672 (considering whether a challenged accommodation "advance[s]" or "inhibit[s]" religion). It is generally the case that laws that alleviate government-imposed burdens on religion "do not encourage anyone to engage in a religious practice." Laycock, *supra*, at 153-54. That is certainly true here. Indeed, it is implausible to suggest that Senate Bill 2 encourages magistrates to adopt a particular religious belief or engage in a religious exercise that they had not already embraced before Senate Bill 2's enactment. The new statute simply ensures that magistrates will not lose their jobs because of their preexisting religious convictions; it does not encourage magistrates to form particular convictions that they did not already have. Because Senate Bill 2's accommodation of religion does not encourage the exercise of religion, it is permissible under the Establishment Clause.

*Fourth*, Senate Bill 2 does not violate the Establishment Clause because it imposes no burden on third parties. The Supreme Court has recognized that religious accommodations steer clear of constitutional concerns when they "take adequate account of the burdens [they] may impose on nonbeneficiaries." *Cutter*, 544 U.S. at 720. Senate Bill 2 does exactly that. Indeed, it requires "[t]he chief district court judge," upon effectuating a magistrate's recusal, to "ensure that all individuals . . . seeking to be married before a magistrate may marry." N.C. Gen. Stat. § 51-5.5(a). This guarantees that all citizens, including same-sex couples, will not be hindered in

their ability to enter a state-recognized marriage. In this way, Senate Bill 2 proactively and expressly accounts for the interests of nonbeneficiaries—a fact that strongly supports its constitutionality.

*Fifth*, Senate Bill 2 is free of any Establishment Clause infirmities because it does not "result in extensive state involvement with religion." *Walz*, 397 U.S. at 689-90. Notably, the legislation makes no provision for the State to inquire into the sincerity of religious belief or to determine the nature of the religious belief giving rise to the need for recusal. Rather, recusal is effective upon request, without scrutiny of beliefs by the State or any other state involvement in religion. N.C. Gen. Stat. § 51-5.5(a) (providing that "recusal [from the performance of marriages] shall be upon notice to the chief district court judge"). Because Senate Bill 2 does not foster state involvement in matters of religion, it is constitutional.

The Supreme Court has considered the above-discussed factors when analyzing Establishment Clause challenges to laws that, like Senate Bill 2, accommodate religion. Thus, evaluating those factors—rather than the three-prong *Lemon* test—is the appropriate method of analysis here. *See Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) (asking whether a challenged statute (1) has a "secular legislative purpose," (2) has a "primary effect . . . that neither advances nor inhibits religion," and (3) does not "foster an excessive government entanglement with religion") (quotation marks and citation omitted). Departing from *Lemon* for particular categories of Establishment Clause claims is nothing new; the Supreme Court does it all the time. *See, e.g.*, *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1818-20 (2014) (applying a historical-focused analysis, rather than "any of the formal 'tests'" like *Lemon*, to reject an Establishment Clause challenge to a municipality's practice of opening its legislative sessions with prayer); *Van Orden v. Perry*, 545 U.S. 677, 686 (2005) (plurality) (concluding that

the *Lemon* test is "not useful" when evaluating an Establishment Clause challenge to a Ten Commandments monument on government property, and applying instead an analysis that was "driven both by the nature of the monument and by our Nation's history"); *id.* (observing that the Supreme Court did not apply *Lemon* in *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), or *Good News Club v. Milford Central School*, 533 U.S. 98 (2001)). Indeed, the Court itself has long recognized that the factors identified in *Lemon* are "no more than helpful signposts" for Establishment Clause analysis. *Hunt v. McNair*, 413 U.S. 734, 741 (1973).

Regardless, the three *Lemon* factors are satisfied here. First, Senate Bill 2 furthers several legitimate "secular legislative purpose[s]." *Lemon*, 403 U.S. at 612. *Lemon*'s purpose inquiry does not require that the challenged "law's purpose must be unrelated to religion—that would amount to a requirement 'that the government show a callous indifference to religious groups.'" *Amos*, 483 U.S. at 335 (quoting *Zorach*, 343 U.S. at 314). And it is undisputed that one "proper purpose" under *Lemon* is "lifting a regulation that burdens the exercise of religion." *Amos*, 483 U.S. at 338; *see also id.* at 339 (reiterating that "a permissible purpose" is "limiting governmental interference with the exercise of religion"); *Walz*, 397 U.S. at 672-73 (upholding a law whose purpose was to "spar[e] the exercise of religion from [a government-imposed] burden"). It could not be otherwise, for that is the very purpose animating the Free Exercise Clause. *See* U.S. Const. amend I. Thus, Senate Bill 2's purpose of relieving government-imposed burdens on religious exercise is a permissible purpose that satisfies the first *Lemon* factor.

Moreover, in addition to accommodating a demonstrated burden on religion, Senate Bill 2 furthers other legitimate secular purposes, which include, but are not limited to, ensuring that public employees do not needlessly lose their jobs, avoiding government manifestations of hostility toward people of faith, guaranteeing that same-sex couples have ready access to state-

recognized marriage, and fostering diversity in the government's workforce. *Cf. Grutter v. Bollinger*, 539 U.S. 306, 328 (2003) (holding that the State has "a compelling interest in attaining a diverse student body"). These additional interests also satisfy *Lemon*'s purpose factor.

The two remaining *Lemon* factors mirror considerations already discussed above, and thus they are satisfied too. The second *Lemon* factor asks whether the challenged statute's "primary effect . . . advances []or inhibits religion." 403 U.S. at 612. As explained above, Senate Bill 2 does not encourage anyone to engage in (or discourage anyone from engaging in) religious exercise. *See supra* at 21. Thus, the "effect" prong of *Lemon*'s analysis is established. And so is the last *Lemon* factor, which forbids the State from "foster[ing] an excessive government entanglement with religion." 403 U.S. at 613 (quotation marks omitted). As previously shown, Senate Bill 2 does not result in extensive state involvement with religion. *See supra* at 22. Hence, the final *Lemon* factor is satisfied as well.

For the foregoing reasons, Plaintiffs' Establishment Clause claim is legally deficient and cannot provide a basis for relief. This Court should thus dismiss that claim.

## CONCLUSION

This Court should dismiss Plaintiffs' Complaint for all the reasons explained herein.

Date: February 4, 2016                    Respectfully submitted,

                                          /s/ Robert D. Potter, Jr.

Robert D. Potter, Jr.                     James A. Campbell*
Attorney at Law                           Kenneth J. Connelly*
2820 Selwyn Ave., Suite 840               Douglas G. Wardlow*
Charlotte, NC 28209                       Jonathan Caleb Dalton*
(704) 552-7742                            ALLIANCE DEFENDING FREEDOM
rdpotter@rdpotterlaw.com                  15100 North 90th Street
                                          Scottsdale, AZ 85260
John C. Eastman*                          (480) 444-0020
CENTER FOR CONSTITUTIONAL JURISPRUDENCE   (480) 444-0028 Fax
c/o Chapman University Fowler School of Law   jcampbell@ADFlegal.org
One University Dr.                        kconnelly@ADFlegal.org
Orange, CA 92866                          dwarlow@ADFlegal.org
(877) 855-3330                            cdalton@ADFlegal.org
(714) 844-4817 Fax
jeastman@chapman.edu                      *Attorneys for Proposed Defendant-Intervenors*

                                          *Notice of Appearance to be filed*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 4, 2016, I electronically filed the foregoing paper with the Clerk of Court by using the CM/ECF system.

All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

Date: February 4, 2016

/s/ Robert D. Potter, Jr.
Robert D. Potter, Jr.